## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PAUL STROVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-23-427-D |
| | ) | |
| MEARS GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Before the Court is the Motion for Summary Judgment and Brief in Support by Defendant Mears Group, Inc. [Doc. No. 24]. The Court also addresses Plaintiff's Motion for Partial Summary Judgement and Brief in Support [Doc. No. 23]. In his complaint, Plaintiff, an African American male, alleges Defendant terminated him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 [Doc. No. 1].

Both motions seek dispositive determinations of the whole or part of this action pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, both motions are denied.

### Authentication and Hearsay

1. *Authenticity Objections*

As a preliminary matter, Defendant objects to the Court's consideration of exhibits 6, 9, 10, 16, and 24 in Plaintiff's response to Defendant's motion [Doc. No. 25]. Defendant argues each exhibit is not authenticated, is not self-authenticating, and is not admissible as evidence.

When objecting to admissibility in a motion for summary judgment, "[t]here is no

need to make a separate motion to strike." Fed. R. Civ. P. 56(c)(2) (advisory committee committee's notes to the 2010 amendments). The proponent of the challenged evidence bears the burden "to show that the material is admissible as presented or to explain the admissible form that is anticipated [at trial]." *Id.* The Court must examine each challenged document on an individual basis to determine authenticity. *See Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.*, 577 F.3d 1164, 1170 (10th Cir. 2009).

A district court may consider an unauthenticated exhibit in a motion for summary judgment if the plaintiff "could likely authenticate the [document] in short order" at trial. *Weinbaum v. Las Cruces Pub. Schs.*, 465 F. Supp. 2d 1116 (D.N.M. 2006) (citing *Barnes v. United States*, 137 Fed. Appx. 184, 189 (10th Cir. 2005)). Furthermore, authentication no longer requires a formal affidavit. Fed. R. Civ. P. 56(c)(2) (advisory committee's notes to the 2010 amendments). Instead, a submitted exhibit might be sufficiently authenticated taking into consideration the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances of its production." *Mohawk*, 577 F.3d at 1171.

The Court is convinced that each objected-to document's appearance, contents, or substance, taken in conjunction with the circumstances of its production, demonstrates authenticity at this point in the litigation.

Exhibit 6 is Defendant's response to a Request for Information sent by the EEOC. Defendant admits the document is what it purports to be. Def. Rep. to Mot. Summ. J. at 2. The Court considers it authentic.

Exhibit 9 is a screenshot of a text message between two deposition witnesses. The screenshot identifies the sender. A Bates stamp located in the bottom right identifies the document as being produced by Mr. Campbell—the purported recipient of the text. The document shows the dates and times that the exchanged messages were sent and received. The Court considers it authentic. *See United States ex rel. Doyle v. All Indian Pueblo Council, Inc.,* No. CV 01-1361 BB/LFG, 2005 WL8163792, at *2 (D.N.M. June 20, 2005) (authenticating an email because it contained the sender's name, recipient's name, and information indicating related dates/times that the email was sent).

Exhibit 10 is an email with the same markers of authenticity as Exhibit 9.

Exhibit 16 is a two-page organizational chart. The first page is titled "Broadband-Bluepeak Program Organizational Chart Phase II." It indicates that Plaintiff Paul Strover (Strover) directly reported to Randy Campbell (Campbell) and Zach Killin (Killin) when he was employed with Defendant. The second page is titled "Broadband Bluepeak Program Oklahoma Organizational Chart." It indicates that Plaintiff held the same position as employee Loyal Lovelady—both were project managers. The first page is dated and both pages bear Defendant's logo and a Bates stamp indicating the source of the document. At this stage in the litigation, the Court considers exhibit 16 authenticated. *See Vitamins Online, Inc. v. Heartwise, Inc.*, No. 2:13–CV–982–DAK, 2016 WL 538458, at *4 (D. Utah Feb. 9, 2016) (authenticating an exhibit partly because of "company logos and other trademarks on the documents").[1]

---

[1] Exhibit 24 is a list of training courses undertaken by three of Defendant's employees. They are dated and list the titles of each course. Although the exhibit is fairly detailed, the

Lastly, as a general matter, although the Court recognizes that Plaintiff bears the burden of establishing each document's authenticity, Defendant does not provide any argument as to how any of the objected-to exhibits are not what they purport to be. The Court is left without any basis by which to consider them otherwise.

2. *Hearsay Objection*

Defendant contests the Court's consideration of certain portions of Campbell's deposition testimony as hearsay. Campbell testified to a conversation with the former Mears Vice President, Richard Jordan ("Jordan"), in which, among other similar statements, Jordan referred to Plaintiff as "the lazy black guy."

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Applying that definition here, Mr. Campbell's testimony would be hearsay if it were offered to prove that Plaintiff was in fact lazy or black. The testimony is not hearsay, however, if offered to prove that racial bias illegally factored into Defendant's calculus in dismissing Plaintiff. The Court will therefore consider the testimony.

---

trainings do not affect the statement of facts as set forth below and the Court therefore declines to rule on this exhibit's authenticity at this time.

## Background[2]

1. *The Perry Project*

Defendant Mears and Clarity Telecom, LLC ("Mears")[3] contracted to install telecommunications lines in Perry, Oklahoma (the "Perry Project"). Most of the project was "aerial," involving the installation of "riser guards," "riser boots," and "fiber," on existing above-ground poles.[4]

In late 2021, Campbell interviewed Strover over the phone. According to Campbell's deposition, the company "did [its] due diligence" before hiring Strover. Mears then hired Strover to take over work on the Perry Project from Loyal Lovelady ("Lovelady"). Strover's annual salary was $100,000.

Strover began work in Perry in December 2021. Strover testified that, by the time he came on, somewhere between 60% and 70% of the aerial construction work was either completed or almost completed.

Once hired, it was Strover's responsibility to organize, direct, supervise, and

---

[2] This statement includes material facts that are supported by the record and not opposed in the manner required by FED. R. CIV. P. 56(c)(1) and LCvR56.1(d). All facts properly presented by a party and not specifically controverted by an opponent are deemed admitted, pursuant to FED. R. CIV. P. 56(e)(2) and LCvR56.1(e). Here, the parties occasionally cite to deposition testimony that does not support the proffered facts. For example, Defendant states Mears employee Christopher Machuca saw "no efforts to fix…issues" at a project site that Plaintiff was assigned to supervise. Def. Mot. Summ. J. at 11. Just above the cited deposition testimony, however, Machuca stated he observed a "sense of urgency of things that needed to get fixed…everybody was trying to fix something." To state that Machuca did not observe efforts to fix any of the project's issues is not strictly faithful to the cited testimony.

[3] D/b/a Vast Broadband a/k/a BluePeak.

[4] *See* Def. Mot. Summ. J., ¶¶ 5-6 and accompanying exhibits.

coordinate construction activities on the job site. This included ensuring compliance with National Electric Code (NEC) and National Electric Safety Code (NESC) specifications.

When Strover arrived in Perry, the project was riddled with problems. Strover testified to "lashing issues, wiring issues, not the correct height," "not placing anchors where they needed to be," "not grounding the poles where they needed to be," and not "using the straps and spacers like they needed to or lug nuts." Strover also stated, "Before you…can move forward, you gotta fix the things that [were] already existing." He later stated that it was his responsibility to do so.

In February 2022, the Executive Vice President of Mears sent Ralph Aspeland ("Aspeland") Director of Special Projects, to Perry. Aspeland testified that, after arriving, he had "never seen a job…that ever looked like this one." He observed "anchors in the poles [that] can come down and kill somebody," and "a failure to follow NESC specifications."

The poor quality of the work in Perry was attested to by others, including Mears's Director of Operations David Owen (Owen), as well as Chris Machuca (Machuca), and Jordan.

Owen testified that he did not know what state the project was in before Strover arrived or whether the problems developed under Strover's supervision. Machuca also testified to observing extensive problems, but when asked if he knew whether Strover had seen the substandard builds, he said he had "no idea." Machuca did, however, testify that he expected construction managers over aerial projects to understand the problems he was seeing, and that he observed a "sense of urgency" among subcontractors under Strover's

supervision to fix the site.

Aspeland testified to observing issues with both Lovelady's and Strover's portion of the project. According to Aspeland, Strover did not communicate a plan to remedy the situation.

Strover's account differs from Aspeland's. According to Strover, although he did not write down a plan to remediate the Perry Project's issues, he instituted a process. He "rode the line" every day, reassigned subcontractors to specific locations, and supervised each task, saying "you have to go back to do A, B, C."

Strover testified that he was not able to finish any of the portions of the Perry Project that he was working to fix before he was dismissed. He further admitted many portions did not comply with NESC specifications and there were "many redoes."

2. *Dismissal*

Aspeland testified to reassigning Strover to a project in Enid, Oklahoma, ostensibly to help him keep his job. Aspeland later received calls from "the guys in Enid" who complained that Strover did not show up. Aspeland said that he checked the GPS location of Strover's company vehicle and observed that Strover had not gone to the site. This was "the last straw." Aspeland testified that he then made the unilateral decision to "let [Strover] go."

In late March 2022, Aspeland met with Strover and informed him that he was terminated. Aspeland then submitted a termination form to Mears's human resources department. In the "Explanation" section, he wrote "project not built to NSE or Customer Spec's. Many re dues."

Strover denies ever being reassigned to a project in Enid. Moreover, he testified that Aspeland dismissed him saying that he was "just doing what [he] was told."

3. *Healthcare Benefits*

Strover testified that he did not receive healthcare benefits while employed at Mears. Paystubs included in Plaintiff's response, however, indicates that money was deducted from Strover's paycheck to pay for premiums.

4. *Evidence Concerning Richard Jordan*[5]

Strover asserts that Jordan, and not Aspeland, was the decisionmaker over his dismissal. As proof, in addition to testimonial evidence, Strover cites five documents: (1) Mears's Response to an EEOC Request for Information; (2) Mears's Initial Response to Strover's First Written Discovery Request; (3) a text message between Jordan and Campbell; (4) an email between Jordan and Lovelady; and (5) Strover's termination form.

In the first two documents, Mears specifically identified Jordan as the decisionmaker over Strover's dismissal.[6]

In the text message, Jordan tells Campbell, "Talking about Paul Strover, I know you said you wanted to talk to Zack about him and that's cool however I want him gone, he is not qualified going forward…."

In the fourth document, Jordan wrote Lovelady an email under the subject heading

---

[5] Although not directly related to this action, Jordan, in his deposition, denied providing information for Mears's position statement to the EEOC on this situation. Mears's corporate counsel, however, received emails from Jordan about Strover's performance two days prior to sending a response to the EEOC.

[6] In Supplemental Responses to Strover's First Written Discovery Requests, Mears later adopted the position that Aspeland was the decisionmaker.

"Clearing the weeds." In the email, Jordan asks Lovelady, "What about Paul [Strover], your thoughts, you know mine?" Lovelady responds, "If He's willing to take a demotion and still have a good attitude? Thinks before he speaks!"

In document 5, the termination form, Aspeland names Jordan as Strover's direct manager.

In Jordan's deposition, Jordan testified to not having had any conversations with anyone about terminating Strover prior to Strover's dismissal.

Campbell testified to discussing Strover's dismissal with Jordan. According to Campbell, Jordan once referred to Strover as "the lazy black guy." Campbell further testified to being told to "fire the black guy" or else Jordan would find someone who would. According to Campbell, Jordan said that "[Strover] talks well with white people and that's why white people like him." Campbell summarized Jordan's comments about Strover as "all racial[,] nothing performance related."

Killin, one of Strover's immediate supervisors while at Mears, provided an account consonant with Campbell's. In an email to Strover dated July 17, 2022, Killin wrote that he too had had a conversation about Strover with Jordan. In that conversation, Jordan told Killin to dismiss Strover and that Strover would be let go along with "anyone that didn't agree[.]" Killin further described Strover as an excellent employee who "worked well with leadership," won customer's confidence, had no corrective actions against him, and lacked grounds for dismissal. Lastly, Killin wrote that he refused to dismiss Strover and went on to resign in protest after hearing Strover had been let go.

9

Jordan testified that he knew that it was Lovelady's, and not Strover's, responsibility to oversee splicing in Perry. When asked if Jordan had blamed Strover for splicing issues, Jordan responded "Not to my knowledge." An email from Jordan to corporate counsel, dated February 1, 2023, states, "Attached are emails showing the delay issues on splicing and testing due to rework necessary because of Paul Strover."

5. *Post-dismissal*

After Strover's dismissal, Mears avers that Strover was not replaced and the company spread his work among existing employees, including Owen.

Strover contests Mears's account. He cites a March 27, 2022, mass-email in which Jordan announced that all in-house and subcontractor aerial work would thenceforth be directed to Loyal Lovelady, a white project manager,[7] who would be "in charge" until more experienced management was hired.

After his employment with Mears ended, Strover sought new employment. He declined a position with AEG paying $75,000 annually. Strover described the position as paying a "low per diem" and requiring rotations for a "month at a time."[8] Strover also stated that he was experiencing marital difficulties with his wife, and AEG's requested start date interfered with the family matter.

In October 2022, Strover accepted a position at Aspen Utility Company earning

---

[7] Some evidence suggests Lovelady and Strover held the same job title: "Construction Manager." A Mears employee, however, testified that Lovelady was not a construction manager but an "engineer for fiber, splicing and stuff."

[8] Strover declined a position with TAK Communications paying $15 an hour and another position with WAVSYS paying $80,000 annually that was a "travel job."

about $75,000 a year. He declined health insurance benefits.

## Standard of Decision

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.* at 255.

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see also* Fed. R. Civ. P. 56(c)(1)(A). The inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**ANALYSIS**

Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Railway Express Agency, Inc*., 421 U.S. 454, 460 (1975); 42 U.S.C. § 1981. Title VII does the same. 42 USC § 2000e-2(a)(1) (prohibiting the discharge of "any individual…because of such individual's race[.]").

In support of his claims, Plaintiff offers both direct and indirect evidence of illegal discrimination.

1. *Direct Evidence*

Direct evidence of discrimination is evidence that demonstrates on its face, without inference or presumption, "that the employment decision was reached for discriminatory reasons." *Danville v. Regional Lab. Corp.,* 292 F.3d 1246, 1249 (10th Cir. 2002); *see also Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022) (defining direct evidence as relevant without "inference or presumption") (citations omitted). When a plaintiff offers direct evidence of discrimination, "[his] claim may move forward without being subjected to the burden-shifting framework set forth in *McDonnell Douglas Corp….*" *Tabor v. Hilti, Inc.*, 703 F.3d 12016, 1216 (10th Cir. 2013).

Comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless Plaintiff can show (1) "the speaker had decisionmaking authority and [(2)] [the decisionmaker] acted on his or her discriminatory beliefs." *Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1008 (1990). The "context or timing of the [discriminatory] statements" must be closely linked to the adverse employment action. *Tabor*, 703 F.3d at 1216. "[I]f the content and context of a statement allow it to be plausibly

12

interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence." *Ramsey*, 907 F.2d at 1008.

As direct evidence of discrimination, Plaintiff cites Campbell's testimony about his alleged conversation with Jordan.

Defendant does not contest that characterizing Plaintiff as a "lazy black guy" who appeals to white people because he "speaks well" qualifies as discriminatory statements. Defendant instead argues the following: (1) Campbell's testimony is hearsay, (2) Jordan denied making such comments, (3) Jordan was not the decisionmaker, and (4) even if Jordan was the decisionmaker, there is no evidence he acted on his discriminatory beliefs.

As described above, the testimony is not hearsay. Moreover, the question of whether Jordan made those comments goes to credibility and is rightly decided by a jury.

Concerning Defendant's third argument, there is a genuine dispute of material fact as to who the decisionmaker was. Evidence that Jordan was the decisionmaker includes the following: (1) two interrogatory answers in which Mears identified Jordan as the decisionmaker; (2) a text message in which Jordan told Strover's supervisor that he "want[ed] [Strover] gone"; (3) Strover's separation notice, prepared by Aspeland, listing Jordan as Strover's manager; (4) an email from Jordan to Lovelady in which the two seemed to discuss employees slated for dismissal; (5) Killin's email stating that Jordan directed Killin to dismiss Strover; (6) Campbell's similar testimony; and (7) Strover's testimony that Aspeland dismissed him because Aspeland was "doing what [he] was told."

Mears contends that the only pieces of evidence that Jordan was the decisionmaker were Mears's mistaken initial responses to multiple interrogatories.[9] As described above, however, Plaintiff has offered more evidence than the interrogatories alone. Based on the evidence presented, a reasonable jury could disbelieve Aspeland's testimony and conclude that Jordan was the decisionmaker.

Defendant lastly argues that, even if direct evidence of discrimination exists, Plaintiff cannot prove Mears acted on the alleged bias. The timing of Jordan's alleged comments, however, taken in conjunction with their content, could convince a reasonable jury that discriminatory bias factored into Mears's decision. According to Campbell, Jordan's comments about Strover were "all racial[,] nothing performance related." Moreover, those comments were made in March 2022, the month Mears dismissed Strover. Lastly, Jordan's alleged discriminatory statements were made against the backdrop of Jordan's categorical denial of ever having had a conversation about Strover's performance prior to Strover's dismissal—a denial that documentary evidence refutes. *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 561 (10th Cir. 1996) (holding that a decisionmaker's comments should be construed "[a]gainst the backdrop" of their context). Accepting Campbell's testimony as true, a reasonable jury could conclude that racial bias factored into Mears's decision to dismiss Strover.

---

[9] Plaintiff cites *Sorbo v. United Parcel Service*, 432 F.3d 1169 (10th Cir. 2005). In Sorbo, the Tenth Circuit addressed whether a "contradiction" between two interrogatory responses created a genuine dispute of material fact. The Tenth Circuit held the contradiction was "simply [the defendant's] correction of a misstatement[.]" *Id*. at 1175.

14

2. *Indirect Evidence*

The Court also finds a dispute of material fact based on circumstantial evidence. "When evidence of discrimination is circumstantial, rather than direct, a plaintiff's claim is subject to the *McDonnell Douglas* burden-shifting framework." *Tabor*, 703 F.3d at 1216.

Under *McDonnell Douglas*, a plaintiff must carry the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-804, (1973). To establish a prima facie case of Title VII discrimination, a plaintiff who is a member of a protected class must show that he "experienced an adverse employment action 'under circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Once a prima facie case of discrimination is made out, "the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for its action." *Ramsey*, 907 F.2d at 1007. If the defendant can do so, the plaintiff "must be given the opportunity to show by a preponderance of the evidence that the reason offered by the defendant is mere pretext." *Id.* (citing *McDonnell Douglas,* 411 U.S. at 802-04).

Here, the Court assumes Jordan's alleged discriminatory statements provide evidence to satisfy Plaintiff's burden at the prima facie stage. Furthermore, the poor quality of the Perry Project would similarly satisfy Mears's burden to articulate a legitimate nondiscriminatory reason for Strover's dismissal. Even so, the Court finds a question of fact remains as to pretext.

Pretext can be inferred "from evidence revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015). Moreover, "dissimilar treatment between similarly situated protected and non-protected employees may give rise to an inference of discrimination." *Eng v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1011 (10th Cir. 2001). Determining the similarity of situations between two disparately treated employees "is generally a fact question." *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1197 (10th Cir. 2021).

The Court finds two reasons a reasonable jury could infer pretext. The first is that, as described above, Jordan testified that he never spoke with anyone about Strover's performance prior to Strover's dismissal. Documentary evidence, however, contradicts Jordan's testimony. Furthermore, Campbell and Killin both testified to having had conversations with Jordan about Strover. That evidence, combined with Mears's about-face concerning the identification of the decision maker part way through this litigation creates an inconsistency such that a reasonable jury could disbelieve Mears's proffered legitimate reason.[10]

Second, some evidence suggests that Mears treated Lovelady and Strover differently despite comparable poor performance. As discussed above, the parties agree that the Perry Project was not in an acceptable state when Strover arrived. Prior to that, Lovelady oversaw

---

[10] Disbelief of a "defendant's articulated reasons for its actions…can establish unlawful discrimination." *Randle v. City of Aurora*, 69 F.3d 441, 452 (10th Cir. 1995) (citations omitted).

the project. Certain evidence suggests that Lovelady specifically oversaw "splicing," the quality of which was widely understood to be inadequate. Despite the poor construction under Lovelady's charge, an email seems to indicate that Lovelady was again placed over aerial work around the time of Strover's dismissal. Adopting all reasonable inferences in favor of the nonmoving party, a jury could conclude illegal discrimination factored into Mears's decision to dismiss Strover because the company replaced Plaintiff, an allegedly poor performer, with another poor performer.

Defendant argues Strover cannot prove disparate treatment for two reasons: (1) because Lovelady was not placed in charge of the Perry Project after Strover's dismissal, and (2) the two employees did not share a direct supervisor (citing *Ibrahim, LLC*, 994 F.3d at 1196) (requiring dissimilarly treated employees to share a decisionmaker).

Concerning Mears's first argument, as described above, a mass-email indicates that Lovelady may have been placed in charge of aerial work around the time of Strover's dismissal. That email provides sufficient evidence to raise a genuine dispute of material fact as to whether Lovelady, in effect, replaced Strover. Concerning Mears's second argument, it was Jordan who sent the mass-email. Jordan was also Mears's Executive Vice President at the time. A reasonable jury could therefore infer that Jordan maintained decision-making capacity over both Lovelady and Strover in March 2022.

In finding that a genuine dispute of material fact exists as to pretext, the Court is aware that Strover admitted that significant portions of the Perry Project required "redoes," and that it was his responsibility to fix the existing issues before moving forward. The poor quality of the Perry Project was attested to by multiple deponents.

The record, however, is complicated by evidence suggesting a measure of imprecision existed as to which manager oversaw the faulty portions of the Perry Project—Lovelady or Strover. Machuca also testified to observing a sense of urgency about fixing the project's many issues while Strover was employed. Strover's testimony further describes that he put in place a process by which to fix the project's problems. Lastly, Strover's direct supervisors described Plaintiff as an excellent employee who did not have any corrective actions taken against him. The evidence of Strover's poor performance is therefore not sufficient to overcome the evidence of pretext described above at the summary judgment stage.

3.  *Benefits*

The parties contest the extent to which Strover received health insurance at Mears. Strover testified to not receiving benefits. Paystubs, however, seem to indicate that premium payments were deducted from Strover's paycheck. It is therefore possible that Strover misremembered. A genuine dispute of material fact exists as to whether Strover received benefits.

4.  *Conclusion*

For the reasons described above, the Defendant's Motion for Summary Judgment is denied.

## Failure to Mitigate

The Court also addresses Plaintiff's Motion for Partial Summary Judgement and Brief in Support [Doc. No. 23]. In that motion, Plaintiff seeks partial summary judgment on Defendant's affirmative defense that Strover failed to mitigate his alleged damages.

18

Defendant bears the burden of proving Plaintiff "did not exercise reasonable efforts to mitigate damages." *McClure v. Ind. Sch. Dist. No. 16*, 228 F.3d 1205, 1214 (10th Cir. 2000). "To satisfy its burden, 'the [employer] must establish (1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position.'" *Id.* (quoting *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980)).

Here, the parties disagree over whether the positions that Strover rejected were suitable. A plaintiff need not "go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. E.E.OC.*, 458 U.S. 219, 231 (1982). But he must not "[refuse] a job substantially equivalent to the one he was denied." *Id*. at 232.

Substantial equivalence "involves more than just similar work—it considers such factors as pay and benefits, promotional opportunities, job responsibilities, working conditions, comparable hours, distance from home, dangerousness, and comparability of status." *Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1211 (10th Cir. 2021).

The Court is persuaded that the situation is analogous to *Equal Employment Opportunity Comm'n v. Bank of Oklahoma*, No. 03-CV-0657-CVE-PJC, 2005 WL 7870753 (N.D. Okla. Jan. 14, 2005). There, a dismissed employee rejected several job offers "either because the salary was too low, or the job was 'too small,' not 'a good fit' for him, or 'not a good match.'" *Id.* at *3 (citing the record). The court ruled that "a genuine issue of material fact exist[ed] as to (1) whether the positions [the plaintiff] rejected were

substantially similar, or suitable, and that [the plaintiff] was qualified for them; and (2) whether [the plaintiff] used 'reasonable' care and diligence by rejecting them." *Id.*

So too here, a question of fact remains. Strover received an offer from AEG for a position paying $75,000 a year. He rejected that offer and later accepted a position with Aspen Utility Company paying a roughly equivalent amount. Strover testified that one of the reasons he rejected the AEG offer was a then-current familial dispute.

The Court is mindful that accepting a position is not necessarily evidence of that position's suitability. Furthermore, the $25,000 difference between the AEG position and the Mears position is undoubtedly significant. Even considering these facts, however, adopting all reasonable inferences in the light most favorable to the nonmoving party, a question of fact remains.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Partial Summary Judgement and Brief in Support [Doc. No. 23] is **DENIED**. The Motion for Summary Judgment and Brief in Support by Defendant Mears Group, Inc. [Doc. No. 24] is also **Denied**.

**IT IS SO ORDERED** this 7th day of March 2025.

TIMOTHY D. DeGIUSTI
Chief United States District Judge